I just want to make a comment at the beginning. You're from the Decker firm? Yes, ma'am. And you're pro bono? That's correct. And I do want to comment on the record because I noticed an article, I think it was in the National Law Journal, about how many less lawyers, large firms, are doing pro bono work. And they did mention the Decker firm as one of those that continues to do it. So on behalf of the court, I want to go back and tell your partners that the court appreciates the fact that you volunteer to do pro bono, that the firm volunteers to do pro bono. And some of the partners are here, so you've just delivered the message yourself. All right. They'll note that. Okay. We'll now hear Dutkevitch v. Pitson Area School District. Thank you. May it please the court. My name is Jennings Durand, and I'm an associate with Deckard LLP, and it is my great privilege and pleasure to have been appointed to represent the appellants in this case. Vincent Dutkevitch is a young man who for years struggled with a disability in the Pennsylvania school system, and I also represent his mother, Sharon Dutkevitch. And I'd like to reserve two minutes for rebuttal. I ask this court to reverse judgment of the district court for the reasons set forth in our brief, but today I want to focus on three specific points. First, the fundamental question before the court is whether taking the allegations as true, Vincent Dutkevitch was denied the benefits of publicly available educational services on the basis of his disability. And I think the briefs show that both the appellants and the appellees cite the Washington case that on the basis of a disability is decided based on a but-for causation test. And I would also emphasize to you what this court has said in the Bowers case. This is the 2007 Bowers decision. In that case, and I won't detail all of the facts, but you'll recall that it was a suit against a number of defendants, including the University of Iowa. And Iowa had a policy that a student athlete couldn't play on the football team or any other team unless they passed the NCAA clearinghouse. That agency had a rule that you had to pass 12 key courses and that special ed courses didn't always count. They usually didn't count towards that requirement. So Iowa, relying on the clearinghouse's policy, found that they could no longer recruit this student athlete because he was a disabled student and he didn't have enough courses that were satisfying this requirement. And the reason he didn't meet the requirement was because some of his courses were special ed courses. When it addressed this issue, the Third Circuit said, and I'll just read from the opinion, Bowers argues that the University of Iowa discriminated against him because of his learning disability, but for the fact that his learning disability precluded him from taking the requisite number of core classes in high school, he would have been given a scholarship by the university. Bowers thus essentially states a claim under Title II of the ADA that he was denied access to a program at a public education institution because of his disability. How does that circumstance fit with Dr. Lynch? In this case, I think that applying the but-for test, we actually have an even closer but-for causal link in this case. The facts are that when he was a sophomore in high school, and Vincent had already been in special education services, his IEP team met, his individual education plan team met, and it was recommended that he, the best place for him, given his interest, his aptitude, his unique circumstances, the best school for him was Westside. It's the computer Bowtech school. But at that same meeting, when he was a sophomore, the IEP team concluded that he was no longer eligible for special education services. That's where the harm starts, really, at that point. That's where the whole catch-22 begins for Vincent. But are you claiming intentional discrimination? We are claiming intentional discrimination. And I'll explain why. Yeah, have you shown intentional discrimination? It is intentional in this way. The impact of the one-two punch from these two policies says it was intentional. Well, impact is different than intent. Throughout the discrimination cases, there's a big distinction between intentional and intentional. And discriminatory impact. We have that in another case. Thursday, we have a possible discriminatory impact case. But that's different than intentional. Where was the intentional discrimination? The intentional discrimination comes, and I've been grappling with this issue myself. I think the easiest way to think of it is to compare it to a situation where there is a policy set up that is thoughtfully intentional. It's intended to include the disabled in what's being offered. In this case, the Westside policy, what it said, the first policy, said a student who is in Vincent's situation, who has been told that he's no longer eligible for special education services, and has to do what any student or parent would do and appeal that so that he can continue to have the right. Westside's policy said that a student in that situation cannot apply to Westside. This was a policy that on its face applied only to people who were in special education. And there may not have been animosity towards this group of people. But the intent question is, unlike a policy where they were trying to include them, this was a policy that on its face excluded them from the application policy. And the only thing that the Dutkovichs could do was fight this IEP decision. Which they eventually won, an appeals panel first reversed the decision. The school authorities continued to fight that decision, and it was ultimately affirmed by the commonwealth court. Could you restate that? How was that intentional discrimination on the part of Westside? For Westside, Westside's first policy of the two that impacted Vincent, on its face, said, you cannot apply to this school if you are a parent. Ultimately, they agreed to waive their entrance requirement and accept Vincent. I mean, the only thing that happened is by then, he had, his family had put a deposit down for the Pittsburgh Art Institute. But the fact that they did that doesn't mean that Westside intentionally discriminated against him. It happened that they had put the deposit down, and they didn't want to, and they couldn't get it back. I mean, why does that show intentional discrimination by Westside? Well, I think that Westside's original action here was intentional. And you are absolutely right. Any time you take an, I remember a philosophy professor once, any time you take an action, it's intentional. But ultimately, they said, we'll take you. We'll waive it, and we'll take you. So how can you tar them with intentional discrimination? It happened that his family put a deposit down. Yes, Your Honor. And what I would say first in terms of, I'm going to make two points here. One is on the effect of the later decision. The fact remains, this student and his mother were trying to navigate this system. And he was, as a sophomore, told, Westside is the place for you to go. He couldn't apply because of the policy that we've already discussed. But then they took that back, and they said, all right, well, after you've shown us all these things, we will let you in. But as I gather, I assume that the deposit at the Pittsburgh Art Institute wasn't refundable. Is that right? It's, I don't know from the record, but the real, I think the more practical problem was just the idea of what were they supposed to do. What he wanted was access to Vo-Tec education, specifically at Westside. He was turned away as a sophomore because he couldn't apply there. He was turned away as a junior because knowing his situation, and with deliberate indifference to his situation, they refused to make an accommodation. You know, I thought that you conceded that Vincent was not intentionally discriminated against. Did I read this wrong? My notes from reading it say that you conceded, because I wrote down that that was an important concession for our purposes. Am I wrong? What we were focusing on in terms of the pure question of has he stated a claim was the fact that I think that what I would phrase it today is you don't have to show animosity towards this particular group. And that you can also get there through the reasonable accommodations problem. I believe that they acted with deliberate indifference when, as a junior, he came to them, no longer barred by the first clause. But that's not intentional discrimination. First of all, let's get this straight. Am I wrong that you conceded that there was no intentional discrimination? I wrote that down. I do not believe that we conceded a lack of intentional discrimination. But you are correct that we're emphasizing that the reasonable accommodation prong is kind of the easiest way to go with this in terms of stating a claim. And I will also note that at paragraph 90 of the complaint, there's a specific allegation. Defendants acted intentionally and with deliberate indifference to Vincent's disability in discriminating against him. By denying him access to Bowtech education. The deliberate indifference prong is something that comes up in other cases that have squarely addressed what is intent for these purposes. And again, in a situation where a city has a policy, there's a Ninth Circuit case called Ferguson that addresses 911 services for people who are deaf. And the policy was intended to include those people in this 911 services. Why isn't it fair policy to exclude students who are involved in due process hearings? I don't know what reasons, and perhaps, Your Honor, discovery would shed some light on it. But what appellees have said in their brief is that they believed they were affirmatively obligated and mandated by federal law. And what they're saying is the state put provision under the IDEA. Given that background, how could it possibly be intentional discrimination? Well, regardless of why they thought they had to do it, when you, I would submit that when you have a policy that on its face says, if you're disabled, you can't apply. If you're not disabled, you can apply. They may have had the best rationale in the world, but that is intent to exclude them. That wasn't the reason they gave. It's that if you're involved in a due process proceeding, we cannot accept you as a student. I understand. And I agree. That's what their policy said. But the policy on its face targeted one group and one group of people only. And that's the people who were in that process of special education. I can't convince you any other way other than to say that that is facially discrimination. Perhaps not ill-motivated, but it is facially discrimination. But your brief takes the position that you don't have to prove intentional discrimination. That is correct. Okay. So that you don't try to prove intentional discrimination because you think you don't have to, although my understanding of the law that many of the circuits think that you do. Yes, Your Honor. And that's an issue that was not raised by the district court and it was not raised by the appellees, which is why it's not addressed in our briefs. But taking your point, the Third Circuit has never adopted that rule. And I think there are policy reasons that we could get into of why it shouldn't apply in this case. But even when you look to those cases, and the case I mentioned earlier from the Ninth Circuit is called Ferguson v. City of Phoenix. It's straight from the line of cases that you're talking about. Ferguson says you can prove intent. This is separate from stating a claim. This is just about the availability of a compensatory damages issue. When you can prove intent in that context by showing actual intent or by showing deliberate indifference. And I've already argued, and I still think it's true, that there was actual intent. Maybe not ill-motivated, but actual intent. That's a different position than you took in your brief. I mean, we really require that you be consistent with your brief and your arguments before us. Well, what the brief is all about is the only issue that the district court reached, and it's the issue that we believe requires reversal. And that is whether they stated a claim. That's what this whole brief and the issues before the court were focused on. The school merely applied neutral policies which worked to his detriment. I'm sorry, I couldn't understand. I don't believe that that's all they did. And I've talked about the first policy. But even when you get to the second policy, here he is, he has won this IEP challenge, and he comes back to Westside and says, hey, I want to apply now again. My IEP team has said I should come here. Think about the Ferguson deliberate indifference problem. And now here you have Westside, knowing that he's disabled, knowing that he has been through this entire saga to fight for his rights to ongoing education, knowing that all he's asking for is the chance to come to school and may well be able to satisfy their two-year rule, and they, with indifference to his plight, with indifference to what he's gone through, with indifference to the fact that he's not going to be able to come to school, he's not going to be able to come to Westside. They refuse to make that accommodation. They are lawsuits that are within the same factual matrix of what's before the court. And the middle district, I think, just said, we are staying these cases, we're not getting into this until the Third Circuit has had a chance to speak. But it is a fact, the law, compensatory damages are not available in the absence of intentional discrimination, right? I mean, that's... The Third Circuit has not made that express holding, as far as I'm aware, but yes, there are other circuits. Or how about discriminatory effect? In other words, if the policy could be neutral, but it has a discriminatory effect on the plaintiff? Well, that's sort of what I was referring to when... Or discriminatory impact. When you are stating a claim, if that's the only issue that we're talking about, how do you state a claim under these anti-discrimination acts, that is the issue. You can show it with actual intent, you can show it with the failure to make a reasonable accommodation, and you can show it with the disparate impact. The separate inquiry, and it's one that's not addressed in the briefs, it wasn't addressed by the district court and has not been raised, is what is intent? If it hasn't been raised, it's not before us. I'm not saying that, I'm just saying that's why the brief is focused on stating a claim. Judge Garth, do you have any questions? No, I do not. Thank you. Good morning. Lucas Repka for the two appellees in this matter, Pittston Area School District and Westside Vocational Technical School. In referring to the arguments put before this court in the instant matter, I believe that their arguments that are put forth have missed the fundamental and or threshold argument that was put forth by the district court. And that's simply, is there an obligation on behalf of either Pittston Area School District or Westside to do anything in this case? The district court indicated based on the facts of this case as pled and admitted by the appellants that student was never enrolled at the Pittston Area School District during the time at issue. In addition, another important fact relied upon in its determination by the district court is simply that Westside does not include the service area. Vocational technical schools are geographic in nature and serve what can be termed service school members. In this instance, the appellants are attempting to impose a burden on a student that has no entitlement under the law to either any assistance by Pittston by virtue of his non-enrollment. This individual voluntarily disenrolled from the Pittston Area School District and was enrolled in a Pennsylvania cyber charter school. By that basis, the Pennsylvania cyber charter school... That's not the Art Institute? No, Your Honor. The Art Institute is post-secondary. The Pennsylvania cyber charter school is a charter school, cyber in nature, that is a completely separate entity. And under the charter school law in Pennsylvania, they become the local education agency. They become the ones that are responsible for the educational services of a child enrolled in the charter school. I thought he had enrolled or sought to enroll in Pittston, but was told that he was overqualified. No, that was in reference to the vocational technical school. Based on his academic credits in terms of the overqualified argument put forth by appellants. The school district has an obligation with anyone within its residency jurisdiction to educate. Under the Pennsylvania charter school law, an individual has the ability to choose which school he attends. Within the district? Well, not necessarily. He can apply to a charter school, and the charter schools have enrollment criteria, generally preferential treatment to those within the jurisdictional limits. But if an individual, say, from the Lehigh Valley, where I'm from, wants to apply to Mastery Charter School in Philadelphia, as long as there's an open spot and they are otherwise qualified to enroll, they can. Was Westside such a charter school within the district? No, the cyber charter school that he enrolled in was the charter school. So that takes the obligation away from Pittston to assist and alleviates the arguments that we intentionally discriminate against them, because there was absolutely no obligation, as indicated by the district court, that Pittston needed to take an affirmative action, and the converse of that, in terms of what the district court was attempting to do, at least in my view, was to simply state that the Pittston area did not deny an educational opportunity to an individual. To the student, in this matter, that he was otherwise entitled to, because he was not enrolled in the school district. He chose to attend a charter school. When you make that decision, the charter school becomes the one responsible for all educational services. That's under the IDEA, evaluations, educational programming, and appropriateness. So, in this context, just by way of an example, if they were seeking any clearance on the claims under the IDEA, Pittston has absolutely no obligation under that, and they would actually have to sue the charter school. Recognizing that relationship, or lack thereof, the negative of that relationship, the district court found that Pittston has no obligation to assist, and therefore did not deny any educational benefit that he was otherwise entitled to. Taking that, again, in that same context, because Westside was not the service area. Or did not serve the Pittston area. There are additional requirements for enrollment. They indicated that because of those additional enrollments, the district court indicated that, again, there was no obligation to accept this student unless he was otherwise qualified. And to do that, then they ran into the two policies that were previously indicated by appellants. One was the restriction not to accept students that are in pending due process hearings. The class that is at issue. Why did they do that? I'm just interested. Well, under 20 U.S.C. 1415J of the IDEA, there is what is termed in the educational world a stay put provision. Stay put. You know, not a lot of technical language there. But the stay put provision basically says that absent an agreement between the LEA, which in this case would be the P.A. Cyber Charter School, and appellants, the pendent educational placement must be maintained, including programming and placement, during the pendency of the due process hearing. Therefore, under federal law, absent an agreement, and there is absolutely no allegation contained within this complaint that indicates that Pittston or Westside was under any knowledge or that there was any agreement to avoid that stay put mandatory provision. And that policy simply implements the affirmative requirement of the IDEA in federal law. The second policy that was discussed today is this two-year requirement policy that an individual must attend for two years to be eligible. You mean must have two more years to go in order to be eligible? Correct. Correct, Your Honor. The program was two years. There is no point, and the opposite of that is a detriment to the student. To place him into a program that he couldn't physically complete serves absolutely no purpose. But ultimately they were willing to waive that, weren't they? Yes, they ultimately did offer to waive that. So he says, well, if they were ultimately willing to do that, didn't they intentionally not do that when he first applied? No, I don't think that's what I understand the appellant to be arguing. I don't believe, Your Honor, that the subsequent measure that was taken here has any indication of intent for the intentional discrimination still required. I mean, it's like a settlement that you don't use. It's a subsequent remedial measure to me that, okay, there was no intent and there was no intentional discrimination as a matter. Was the policy changed or was it a specific accommodation? To my knowledge, it became a specific accommodation that was a waiver for this student. And it really is a fundamental alteration of the program. And that raises a subsequent question that's also contained in our brief about the requirement or necessity to make an accommodation because you are required to make reasonable accommodations if, and I submit to the court, neither of my clients had an obligation to do so. I think that's a threshold question. But if they do have an obligation to make an accommodation, they're only obligated to make reasonable accommodations and fundamentally altering a program does not qualify and therefore would maintain that, again, that's another basis for which there is no intentional discrimination in this matter and no damages. I mean, the ultimate conclusion here by the district court was there was no obligation because this student was not entitled to what he's asking for from either client. Well, I don't understand that so much. He resided in Pittston. Correct, Your Honor. And so Pittston should have tried to help him get him into Wilkes-Barre. But instead it, according to my notes, it decided he was overqualified because he had already had two years or more at a community college. So didn't Pittston have some obligation to him? He lived there. He lived there. But he chose to enroll in a different LEA. And that's what the district court indicates. LEA. I'm sorry. It's a local education agency. When you talk about school districts under the law in terms of obligations, each school district is an LEA. It's a local education agency that's responsible in and of itself for education. Under the charter school law, because they are public schools even though they're not technically school districts, the charter school law mandates that any therefore it has a completely separate entity than a school district. When a student enrolls in a charter school, albeit bricks and mortar, or in this case a cyber charter school which is done over the computer, that cyber charter school, that entity becomes the LEA and is responsible and is solely responsible for all of the educational benefits to be conferred to those enrolled. It essentially took it out of Pittston's hands. Pittston could not issue, there are what I'll term operative documents, either under the IDEA or special education, such as NORUPS and things that implement or allow for consent. Who was his LEA then? The cyber charter school. Is that what it was called, cyber charter school? It's called the Pennsylvania Cyber Charter School. And that's what the district court relied on in finding there's no obligation. So he had never enrolled in Pittston? To my knowledge, Your Honor, I'm not sure. I believe he was enrolled at one point, voluntarily disenrolled, and then entered the cyber charter school. But at all times relevant to any averments contained in the complaint, he was attending the cyber charter school. So he was not at the time relevant to this issue ever in Pittston. And that's where the district court says there's no obligation because in reality, Pittston couldn't even offer a program. Technically, it's the LEA. They have the ones that have to determine the appropriateness of special education programming. They have to determine the placement that's appropriate for the student. And all of those things that go with it, they issue all of the documents. Pittston, by operation of his enrollment, is essentially taken completely out of the educational parameters of the student. Was there a time that he was told by Pittston that he was overqualified for the program that he wanted to pursue? Your Honor, I understand that that's an allegation. And for the purposes of the 12B6 motion, we have to accept that as correct. He had attended two, according to my notes, he had attended two years at a community college. Correct, Your Honor. That's my understanding as well. Based on the averments contained in the complaint, again, taking them as true, that he did obtain even the educational benefit he's still seeking. He completed computer courses at the local community college. And from my understanding of the district court's interpretation of the averments and the argument at the lower court, that that was essentially the same program he was seeking at Westside. He graduated, did he ultimately graduate from the Pittsburgh Art Institute? I don't, Your Honor, I do not know that. No, I care about the people involved. Well, he did graduate in September of 2008, which is the conclusion of his senior year. Albeit not the traditional June, but with the cyber charter school, sometimes it can do that. So in my understanding, it was shortly after that he did attend the Pittsburgh Art Institute. Where he went after that is not contained in the complaint, nor do I have any independent knowledge of his continuing studies. Judge Barth? No, I don't have any questions to ask. Okay. Thank you. Thank you for your time. I think you saved two minutes, Rebuttal. Is that right, Mike? I saved two minutes. I keep hoping to enlarge those two minutes, but I'll keep it brief. No, no, we've got a busy schedule. The stay put provision that was referred to, I think the Burlington Supreme Court You can't enlarge in the Supreme Court. The Burlington Supreme Court case holds that the stay put provision does not mandate that a parent stick with the IEP plan. A parent has a right to unilaterally change. And I want to get back to this concept of What kind of money are we looking at? He's asking for, Tom, he's asking, or his mother, is asking for the money that he spent at the Pittsburgh Art Institute. Is that right? The complaint does ask for that, but it also asks for damages related to the loss of the educational benefit to the VOTEC services which have been recommended. Yeah, but how much was the tuition? I do not know how much the tuition was. To get back quickly to the intent question. Yeah. The other cases, and I've cited the Ninth Circuit case, look at that in terms of intent and deliberate indifference. I've cited the complaint's allegation that there was intent. And I'll just quickly note on page 30 of our brief, we do say the denial of the benefits of VOTEC education was discriminatory because it was based directly on his disability. And I want to point again to the Bowers case. The way that Bowers came to this question of, you know, is there a but-for causation in the claim against the University of Iowa, it came to that issue in context of whether there was a valid abrogation of sovereign immunity under the ADA. What that's talking about is, is there a money damages claim against the University of Iowa by abrogating sovereign immunity? And the facts of that case show as direct a link, or a more attenuated link between the denial of access compared to this case. In Bowers, Iowa didn't have a policy that said you can't come if you've got a disability. It relied on another entity's policy, the clearinghouse policy, that excluded credit for disability courses. In this case, West Side had two policies. The first one, he was impacted by the fact that it was its own policy that on its face discriminated against him and said he couldn't apply until he had won his challenge. So I think the facts of Bowers, and the fact that it was addressing the abrogation of sovereign immunity and therefore money damages, show and control the outcome of this case. Thank you. Thank you. Thank you, gentlemen. We'll take the matter under advisement.